UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JODI ANN JONES, individually and as assignee           :
of Jack Becht, MATT FRANKLIN, EVGENIY
KIRICHENKO, WILL NOCK, HIMLA                            :
HOLDINGS, INC., ERIN MARSZALEK, FRANK
PITT, individually and in his capacity as a trustee    :      17 Civ. _____ (    )
under a Will dated February 2, 2016, ADAM
RODRIGUEZ, MARIA RODRIGUEZ, ZACHARY                     :      COMPLAINT
RODRIGUEZ, and XIAO LING WENG,
                                                       :      JURY TRIAL DEMANDED
                           Plaintiffs,
                                                       :

            - against -                                 :

THE BLEACHERS CORPORATION, SAM                          :
KLEIN, KF PECKSLAND LLC, JOSEPH LIPARI,
MICHAEL BAIR, J. LAWRENCE CONNOLLY,                     :
DUNCAN EDWARDS, MICHAEL GUTH,
FRANK B. JORDAN, EMILY MOMMSEN,                         :
MORRIS W. OFFIT, ROBERT ROSENBAUM,
and WILLIAM D. RUECKERT,                                :

                           Defendants.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiffs Jodi Ann Jones (individually and as assignee of Jack Becht), Matt

Franklin, Evgeniy Kirichenko, Will Nock, HIMLA Holdings, Inc., Erin Marszalek, Frank Pitt

(individually and in his capacity as a trustee under a will dated February 2, 2016), Adam

Rodriguez, Maria Rodriguez, Zachary Rodriguez, and Xiao Ling Weng, allege as follows:

### Jurisdiction

      1.   The jurisdiction of this Court over the within action rests upon 28 U.S.C.

§ 1331, in that the complaint in this action asserts violations of the laws of the United States,

specifically of the Securities Act of 1933, 15 U.S.C. § 77a *et seq*. (the "1933 Act"), and the

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "1934 Act").  The jurisdiction of this Court over the common law and state statutory claims asserted in the complaint in this action rests upon 28 U.S.C. § 1367, in that such claims fall within the supplemental jurisdiction of this Court.

### Nature of the Action

2.   This is an action for securities fraud (that is, for violations of Section 12 of the 1933 Act, 15 U.S.C. § 78l, and of Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5), for common law fraud and misrepresentation, for breach of fiduciary duty, for breach of the fiduciary duties of corporate officers and directors of care and loyalty, to impose liability predicated on control person status under Section 15 of the 1933 Act, 15 U.S.C. § 77o, and Section 20 of the 1934 Act, 15 U.S.C. § 78t, and for violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq*.

3.   Plaintiffs seek to recover compensatory damages in the principal sum of Seven Hundred and Eighteen Thousand ($718,000.00) Dollars, together with applicable prejudgment interest, attorneys' fees as provided by applicable law, the costs and disbursements of this action, punitive damages at common law and under the Connecticut Unfair Trade Practices Act, and such other relief as the Court may deem just and proper in the circumstances.

4.   In connection with the activities of the defendants described below, defendants utilized and employed the means and instrumentalities of interstate commerce, including internet, telephone, and other means of communications.  Acts, transactions, and omissions constituting violations of the 1933 Act and the 1934 Act occurred within the Southern District of New York.

## THE PARTIES

### Plaintiffs

5.      Plaintiff Jodi Ann Jones, individually and as assignee of Jack Becht, is an individual residing at 20 Beacon Way, M-307, Jersey City, New Jersey 07304.  Plaintiff Matt Franklin is an individual residing at 86 Traditions Way, Powell, Ohio 43065.  Plaintiff Evgeniy Kirichenko is an individual residing at 1674 West Fifth Street, Apt. C2, Brooklyn, New York 11223.  Plaintiff Will Nock is an individual residing at 2112 SW 16th Terrace, Fort Lauderdale, Florida 33315.  Plaintiff HIMLA Holdings, Inc., is a privately held company with a place of business at 2112 SW 16th Terrace, Fort Lauderdale, Florida 33315.  Plaintiff Erin Marszalek is an individual residing at 2222 Franklin Street, Apt A, Denver, Colorado 80205.  Plaintiff Frank Pitt (individually and in his capacity as a trustee under a will dated February 2, 2016) is an individual having an address at PO Box 410682, Melbourne, Florida 32941.  Plaintiff Adam Rodriguez is an individual residing at 65 South 11th Street, Brooklyn, New York 11249.  Plaintiff Maria Rodriguez is an individual residing at 52 Reeds Lane, Flintstone, Georgia 30725.  Plaintiff Zachary Rodriguez is an individual residing at 52 Reeds Lane, Flintstone, Georgia 30725.  Plaintiff Xiao Ling Weng is an individual residing at 2068 East 24th Street, Brooklyn, New York 11229.

6.      Each of the plaintiffs, under varying circumstances and sometimes in different forms, were and are holders of interests in defendant KF Pecksland LLC, and through KF Pecksland LLC, in defendant The Bleachers Corporation, as fully detailed below.

### Defendants

7.      Defendant The Bleachers Corporation ("Bleachers") is a corporation duly organized and existing under the laws of the State of Delaware.  Until on or about February 9,

2017, Bleachers had its principal offices at 300 First Stamford Place, Stamford, Connecticut 06902.  Bleachers has ceased to engage in active business activities.

8.   Defendant KF Pecksland LLC ("KF Pecksland") is a limited liability company organized under the laws of the State of Delaware, and having its principal place of business at 131 Pecksland Road, Greenwich, Connecticut or at 300 First Stamford Place, Stamford, Connecticut 06902, the former offices of defendant Bleachers.  (KF stands for "Klein Family," and Pecksland is the name of the road on which the Klein family home is and located.)

9.   At times relevant to this complaint, defendants Michael Bair, J. Lawrence Connolly, Duncan Edwards, Michael Guth, Frank B. Jordan, Sam Klein, Joseph Lipari, Emily Mommsen, Morris W. Offit, Robert Rosenbaum, and William D. Rueckert were executive officers or directors of Bleachers, and in the case of defendant Klein, an executive officer and director of defendant Bleachers.

### FACTS COMMON TO ALL CLAIMS FOR RELIEF

#### The Background of Klein and the Offering of Bleachers Shares to Its Management

10.  Defendant Sam Klein ("Klein") is an entrepreneur who holds himself out as having achieved enormous financial success in his career.  According to Klein, he amassed a fortune of at least $10 million early in his career by having sold a company he developed to Staples, Inc.  He claims to have multiplied that small fortune into an even larger one by investing in undervalued and distressed real estate in New York City.  Klein resides at 131 Pecksland Road, Greenwich, Connecticut, in a 7,691-square foot residence located on 3.8 acres in a prime estate area of Greenwich.  Klein is the founder and was the chief business development officer of defendant Bleachers.

11.   Defendant Bleachers was formed in 2010 as a global digital media company specializing in live event HD production and streaming for independent and private school markets, sports leagues, sports venues, and other organizations, distributing and managing their sports, music, academic, and special event content, live and on-demand.

12.   Upon information and belief, Bleachers' founder Klein was initially the owner, possibly through defendant KF Pecksland and through another affiliated limited liability company, of 100% of the stock of Bleachers.

13.   Bleachers was a privately-held corporation.  According to an SEC Form D filed in May 2013, Bleachers first offered securities to outside investors in that month.  The Form D indicates that the date of first sale was May 7, 2013.

14.   The Form D indicated that this offering had a minimum investment of One Hundred Thousand ($100,000) Dollars.  The Form D disclosed that Bleachers was filing for an offering in a total amount of Ten Million Dollars ($10,000,000) Dollars, of which One Million ($1,000,000) had been sold in the offering.  The Form D also indicated that defendant Klein was both an executive officer and director of Bleachers, that defendants Jordan and Mommsen were executive officers of Bleachers, and that defendants Lipari, Rueckert, Edwards, and Connolly were directors of Bleachers in addition to Klein.

15.   In addition to the defendants named in paragraph 9, above, who were directors of Bleachers as of May 7, 2013, defendant Offit and defendant Rosenbaum later also became directors of Bleachers.

16.   In addition to the defendants named in paragraph 9, above, who were executive officers of Bleachers as of May 7, 2013, defendants Bair, Jordan, and Guth also later became officers of Bleachers.  Defendant Michael Bair became chief executive officer,

defendant Frank Jordan became chief revenue officer, and defendant Michael Guth became chief operating officer.  Defendant Emily Mommsen in May 2013 was (and thereafter remained) the chief financial officer of Bleachers.

### Jodi Ann Jones and Klein and Their Relationship

17.  Plaintiff Jodi Ann Jones ("Jones") is a professional photographer whose work is principally in the fashion industry.  She has achieved a significant degree of success in her career, and has become well-known and is sought out for frequent photo shoots at the apogee of the professional photography world.  She teaches the skill and art of high-level photography, and has served as an ambassador for several of the leading camera manufacturers in the world.  She executes her work through her studio, Jodi Jones Studio LLC.  Jones is currently 47 years of age.  Although accomplished professionally, in the period of 2014 through January 2017 Jones had virtually no knowledge or understanding of the financial or securities industries, of investing and investments, of finance, or of start-up companies and entrepreneurship.

18.  Defendant Klein has varied interests and pursues varied activities but his principal activity as to Jones appears to have been convincing her how wealthy and successful he was.  As hereafter detailed, he did this to induce her fraudulently to purchase interests in defendant KF Pecksland, representing ownership in Bleachers.  Klein is currently 61 years of age.

19.  Among Klein's interests also was apparently adventuring, and documenting his adventuring, and this is the context in which he sought out and first met Jones.  In March or April, 2014, Jones received a call from Klein's executive assistant, a woman named Gabrielle Ferrara.  Ferrara asked Jones if she would undertake to teach Klein how to use an advanced high-level Hasselblad camera, with which he planned to document a ski trip in Alaska where Klein

and one of his daughters would engage in heli-skiing, jumping from a helicopter onto a mountain to ski the mountain.  Jones was expert in the use of this camera and serving as a Hasselblad ambassador at the time.

20.   Jones agreed to do so, and in teaching Klein photography over the next months she and he became friends.  As their friendship developed, Klein began to turn to Jones more often, and assumed the role of mentor to Jones, with Jones serving as his mentee and protégé.

21.   There developed between the two a relationship in which Jones reposed her trust and confidence in Klein.  Klein frequently declared, to Jones and others, that he "ought to adopt [her]."  He invited her frequently to visit his home in Greenwich.  She was living then part-time in Florida, and would fly to New York to meet with Klein at his home.  She was a weekend guest on one occasion at his home.

22.   Klein made clear that he had no romantic or sexual interest in or intent as to Jones, and that his interest in her was that of a friend and mentor alone, who could and would introduce her to the world in which he lived among the "one percent of the one percent."  He claimed to be colleagues and friends with some of the wealthiest people in the United States.  He encouraged her to take her success in the fashion photography world to a higher level.

23.   In short, there arose a fiduciary relationship between Klein and Jones.

24.   Among the stories that Klein told Jones to induce her belief that he was highly successful and extremely wealthy, was that he had started out in business as a young man with virtually no money, and that early on he had developed a company, selling pens and paper to Wall Street firms, that he sold to Staples, Inc. in or about 1988 or 1989 for $10 million.  Staples, Inc. commenced business activities in 1986, with a single store in Brighton,

Massachusetts.  While it became a successful company, at the time Klein claimed to have sold his allegedly emerging business to it, it was hardly able to have acquired such a business, much less one for which it paid $10 million.  Upon information and belief, this story was false.

25.  Klein also shared with Jones many other putative aspects of his life, apparently to bolster his claims of wealth and influence.  For example, he showed Jones a photograph of a private jet, representing that he owned it.  (He did not.)  He showed Jones weekly drone footage of an extremely costly home in Jackson, Wyoming that he claimed to be building, and that he was to furnish with personal belongings and art and other objects worth hundreds of thousands of dollars.  (This claim is flatly inconsistent with his later apparent acute need for funds on which to live.)  He showed Jones a condominium located at 56 Leonard Street in New York City, representing that he owned it and that it was worth $15 million.  (While selling this property, he "borrowed" $5000 from Jones, which he never repaid.)  He bragged that his Greenwich home was located on a road known locally as "Billionaire's Row."  (This may be true.)

**The Bleachers Corporation**

26.  From the beginning of their relationship, Klein discussed Bleachers with Jones.  Klein described Bleachers as a "Billion Dollar Company."  He referred repeatedly to the accomplishments, reputations, wealth, and billionaire status of certain of Bleachers' board members, particularly of defendants Robert Rosenbaum, William Rueckert, and Morris Offit, to suggest that Bleachers was both a highly successful company and one in which accomplished investors had placed their confidence.  He displayed to Jones video footage of himself and defendant Rueckert at the Rockefeller family dinner, and told her he would make her a part of this elite group.  He told Jones and other of the plaintiffs that defendant Rueckert had committed

investments in Bleachers in the millions of dollars and that defendant Offit had invested as much as $10 million.

27.   Klein explained to Jones that Offit was a renowned investor who ran a highly successful hedge fund called Offit Capital.  He told Jones that she and her friends and family could never invest in Offit Capital as the minimum investment was $100 million, but that they could invest side by side with Offit in Bleachers.  Klein assured Jones that Offit's imprimatur on Bleachers with his investment was sufficient due diligence standing alone, and that she should not feel she needed to do more.

28.   As to his own investment in Bleachers, he told Jones that he had capitalized the company with $10 million of his own, and he explained to her that now that the company was in active operations, he would double his investment each year, so that his $10 million would become $320 million in five years.

29.   Klein told Jones other stories designed to inflate her opinion of his prowess as an investor and businessman.  Klein told Jones that he had earned $1.5 million per week in real estate, and had had 3200 employees who worked to service the properties in his personal real estate portfolio.  Klein told Jones a story about purchasing stock in a public company, and then making $1 million in one month selling it short.

30.   Klein told Jones that on behalf of Bleachers he had hired Christopher Nolan, the famed director of the "Batman" movies, to direct a video for the company for a presentation in Australia.  Jones was surprised at this, and asked Klein how Bleachers could hire such a famed director.  Klein responded, "When you have a billion-dollar company, you can hire whomever you want."  Jones, a year later, discovered that the "Chris Nolan" that Bleachers had hired was

not the Chris Nolan of "Batman," but rather a not so well-known director of industrial and commercial videos.

31.   Klein's statements were largely false, and were intended to instill in Jones a picture of Bleachers that was untrue.  In fact, Klein was subjecting Jones to a campaign of lies and deceit to paint a false picture of himself and of Bleachers.  As detailed below, he was successful in doing so, and used his influence over her and pressure on her to extract investments from her and her friends and family.  In November 2016, a former officer of the company told a close acquaintance of Jones that Klein had been using Jones, and that he had bragged about his influence over her, describing her as a famous, millionaire fashion photographer from whom he could and did extract monies.

**The Australian Trip and the Option Grant**

32.   In June 2015, Klein told Jones about an upcoming trip to Australia, where he was to give a presentation about Bleachers.

33.   Klein proposed to Jones that she accompany him on the Australia trip to photograph children in the Australian schools that he hoped to recruit for Bleachers.  He proposed that Bleachers would produce a coffee-table book of her photographs as a promotional vehicle.  He asked Jones to render a mock design and project pricing so that he could present both to the Bleachers' board of directors, telling her that he had to obtain board approval for the book and for Jones to accompany him on the trip.  She did so.

34.   In or about July 2015, Klein assured Jones that he had obtained the approval of the Bleachers' boards of directors.  Jones told Klein that she would accept an option to purchase Bleachers stock as compensation for her work on the Australia trip.

10

35.  From August 8, 2015 to August 20, 2015, Jones accompanied Klein in Australia.  Klein and Bleachers put Jones up in four-star accommodations in Sydney, and the two of them spent several days touring before engaging in any work.  Jones rented special photographic equipment for this trip, a cost for which neither Klein nor Bleachers reimbursed her.

36.  As they returned to New York from Australia, Klein in a first-class seat and Jones in a coach seat, he texted her and told her that since he was being met by Bleachers' staffers at the airport, she had to "please keep this mum," since Jones's presence on the Australian trip was a "secret."

37.  On or about October 1, 2015, some six weeks after their return to the United States, Klein advised Jones that the option grant to Jones was on the agenda for an October 13, 2015 Bleachers board meeting.  He also advised her that his attorney, defendant Lipari, was preparing the documents.  Notwithstanding this advice, he neither reported to her whether the board of directors had approved the option grant nor delivered any "option."

38.  The board of directors of Bleachers conducted a meeting on January 13, 2016, at its Stamford, Connecticut headquarters.

39.  Klein ultimately delivered to Jones an instrument titled "assignment" on January 20, 2016, describing it as the "option" he and Bleachers had promised her as her compensation for her work in Australia.  To deliver the "option," Klein had asked Jones to come to the Bleachers office in Stamford, Connecticut.  She flew from Florida to New York, and took a train to Stamford to do this.  He gave Jones a tour of the office, and introduced her to the Bleachers "team," including defendants Bair, Guth, Mommsen, and Jordan, as well as Klein's assistant Gabrielle Ferrara.

40.   The so called "option," which was dated January 13, 2016, was not an option in any sense.  Instead, it was simply an assignment from Klein purporting to transfer to Jones an "approximately (.273%) ($10,000 value at a $50 MM valuation)" interest in KF Pecksland.  It is questionable whether this instrument even represented correctly what it purported to "assign." Klein misrepresented this instrument as an "option" in Bleachers, and assured Jones that the Bleachers board of directors had approved it.

41.   At the same time, Klein talked up the prospects and business of the company, and when he ultimately gave her the "option," told Jones that Bleachers was granting her the option at a valuation for Bleachers of $50 million, but that since the company was valued at $100 million at that time, her 10,000-share option was already a 20,000-share option (that is, she had already doubled her investment).  This statement was also flatly false and misleading.  The minutes of the January 13, 2016, board meeting of Bleachers reflect a determination by the board of directors of Bleacher to place a $20 million valuation on the company for future sales of its shares.

42.   The same day that Klein delivered the "option grant" to Jones, he continued his scheme designed to make Jones a mark for his fraudulent acts and omissions.  That day, he said to her, "I want you to do me a favor.  Will you trust me?"  He proceeded to tell her a story about the famed creator of the cable news network CNN, Ted Turner.

43.   He told her that Turner sailed with a colleague named Gary Jobson, that Turner urged Jobson, who had no significant savings, to "beg, borrow, or steal" money to invest in CNN, that Jobson did so, investing $40,000, and that a year later he had become a multi-millionaire as a result of this investment.

44.   Although there is a Gary Jobson who is a renowned sailor and was associated with Turner, there is nothing readily available in the public record from which to verify this story.  Upon information and belief, it was false, and was simply part of Klein's continuing crusade to present himself as something that he was not and to further induce Jones to rely upon him, to trust him, and to believe in him.  He stated he intended to do the same for her.

### KF Pecksland LLC

45.   It was a part of Klein's scheme and artifice to deceive that he represented to Jones that Bleachers could not issue an option (or its shares) directly to her because it had established a $1 million threshold for minimum investments, and because to qualify for such an investment she would have to show a $10 million net worth.  Instead, he advised Jones that since KF Pecksland owned a majority of the shares of stock of Bleachers, he would offer or grant her "shares" in KF Pecksland.

46.   Consistent with this "explanation," the so-called "option" he delivered to Jones on January 20, 2016, was between her and KF Pecksland.  But Klein explained that while it was structured as an "option" to purchase an interest in KF Pecksland, his family entity, and not Bleachers directly, it had been approved by the Bleachers board of directors.  His description of the "option" was false in this respect as well.

47.   He assured her that her investment was safest in KF Pecksland because it held his family's stock in Bleachers, and would therefore be the first stock to be redeemed if Bleachers was sold.  He also told her that it didn't matter that the option was structured through KF Pecksland: because KF Pecksland owned only Bleachers stock, its performance mirrored that of Bleachers.

13

### Jones's First Direct Investment

48.   On January 21, 2016, the day after Jones's visit to Bleachers' offices, and the day after Klein had delivered the "option," Klein called Jones to advise her that a minimum investment in Bleachers was $100,000, but that he could sell her $181,000 of his interest in KF Pecksland, representing an investment in Bleachers in the same amount.  He called her later that day to add that he might allow her to invest an additional $250,000 before March 5, 2016.  He pressured her by telling her that he had to know her answer immediately, that this was "a once in a lifetime deal," and that she should sell everything she had (specifically referring to real estate he believed she owned) to be able to make the investment.

49.   To induce her to make this investment, Klein told Jones, among other things, that he "would never let [her] lose a cent" because he would stand behind any loss and reimburse her therefor, that he would "change [her] life," that she had to "trust" him, and that, if she had an emergent need for any of the monies invested, she would only have to text him and within 2-3 days he would "cut her a check."  He did not explain why he imposed an imminent deadline nor why it was pressing that Jones make her investment immediately.

50.   Jones did not have sufficient funds to afford an investment in Bleachers.  She had little in the way of savings, and an uncertain stream of income from her work.  She approached a friend, plaintiff Matt Franklin ("Franklin"), and informed him of the opportunity that Klein had offered her, explaining the background of her relationship with Klein, what she had learned from Klein about his highly successful business dealings, and what he had told her about Bleachers, as hereinabove alleged.  Franklin became Jones's partner in the investment.

51.  At no time did Klein provide Jones with a prospectus, with financial statements, or with any other information that a reasonable investor would have considered to be material in deciding whether to invest in Bleachers.

52.  In seeking her investments, Klein actively discouraged Jones from consulting with any financial adviser, lawyer, or accountant.  In response to Jones's inquiries about performing due diligence, he constantly assured her that the extensive financial expertise of the Bleachers board of directors was all the diligence that was due.  He pointed especially to the expertise of defendant Offit.

53.  Klein structured the transaction.  Klein told Jones that defendant Lipari, who is not only a director of Bleachers but also a partner in the Roberts & Holland law firm in its New York City office, was his long-time counsel, and that he had prepared and approved the instruments that Klein had her execute, including the "option" he had earlier delivered to her. Klein also assured Jones that the instruments he had her execute were the same instruments that all Bleachers investors, including Offit, had signed.

54.  Klein did not tell Jones that in January 2016, Bleachers was essentially out of cash, that the members of its board of directors had refused to infuse any more of their funds into the company, that without a cash infusion Bleachers was on the verge of collapse, and that only continued investment was keeping the company alive.

55.  In fact, at its January 13, 2016, board meeting, the board made it clear that current and next round investment were priorities, and directed that immediate steps be taken to remedy the current "undercapitalization" of the company which was jeopardizing the company's ability to execute its business plan.  The minutes of that meeting make clear that Bleachers was in serious trouble, stating, "[w]e are at a critical junction."  None of this did Klein disclose.

56.  Klein represented to Jones that her investment would be made at a valuation of Bleachers of $50 million.  Klein did not advise Jones that the board of directors had directed that investment in Bleachers in its current round were to be made at a "$20 million pre-money valuation."

57.  Jones made her first investment of funds in Bleachers on January 26, 2016, in the amount of $130,000.

**Klein's Continued Solicitation of Investments from Jones**

58.  Notwithstanding his knowledge of Bleachers' parlous condition, and notwithstanding that he had already induced her to make one investment (of $130,000) based on material misrepresentations and omissions, Klein continued to solicit Jones for funds, urging her not only to invest what she had, but also to bring her "friends and family" into the investment.

59.  He encouraged her to invest further by assuring her that he wanted to help not only her but also her "friends and family."  He told Jones that he "had to be very selective in who he could bring in as Bleachers is about streaming children over the internet, so everyone had to be squeaky clean."  He encouraged her to approach them for investment by advising her that they would never have a chance of this kind to make such "amazing returns" on an investment.

60.  At the same time, he advised her that such investments needed to be made under her name exclusively.  Klein told Jones, "Put whatever you can now into Bleachers stock, sell any real estate you have, and then in 2 to 3 years when you are rich, we can go out and do some real estate deals together."  Defendants Mommsen and Bair sent Klein a Bleachers deck to give to Jones to support her efforts

61.  In the following months, in response to continuing and relentless pressure from Klein to locate additional investors and to invest additional funds herself, Klein told her

"the timing is just right… you need to put it all in! We are under a 'confi' [confidentiality agreement] for [a large company] to [purchase] 49% [of Bleachers] and you are going to be rich!"

62.   On February 2, 2016, Klein invited Jones for drinks at an expensive New York restaurant.  He told her that he was meeting for dinner with a highly-placed executive from Ogilvy who was interested to invest "millions" with Bleachers.  Klein advised Jones that although this gentleman had learned about Bleachers from another board member, Klein was not prepared to allow him to invest.  According to Klein, Bleachers had to be very selective in bringing in new investors.

63.   On February 4, 2016, Klein called Jones to advise her to invest additional monies, telling her that Bleachers was about to sign a contract with FIFA to stream its tournament events globally, and that "other than rob a bank you need to put it all in."  (FIFA is the Fédération Internationale de Football Association, the international governing body of football, responsible for football's major international tournaments, notably the World Cup which commenced in 1930 and the Women's World Cup which commenced in 1991).

64.   During this same call, Klein described the alleged FIFA contract as a "game changer," and compared his offer to Jones to make additional investments to being offered Facebook stock before it was successful and before it had its initial public offering.  He asked Jones whether she ever got such offers, and she of course answered no.  He explained that he and Offit, and Rueckert, and Mommsen, and Jordan did get such offers, and again urged her to do everything necessary to increase her investment.

65.   Jones asked Klein what had happened with the Ogilvy executive he had met with.  Klein responded that that he had wanted to invest $5-6 million in Bleachers, but Klein had

turned him down because "he was too much of a playboy," and "was not the sort of person [Klein] wanted associated with" Bleachers.  He again advised Jones that the company was not looking for investment, that the board was extremely wealthy and would support the company with adequate capital, and that he had presented this opportunity to her only as a favor to her.  He told her that he "want[ed] [her] to go out and make a difference on this little blue dot when [you are] wealthy."

66.   In reaction to what Klein had told Jones, she began talking to another of her friends about an investment.  The two met with defendant Mommsen for about 45 minutes to discuss investing in Bleachers through KF Pecksland.  Mommsen followed up with documents and spreadsheets referring to the "MO" [Morris Offit] valuation.  Ultimately, on or about March 2, 2016, that friend made an investment in Bleachers (through KF Pecksland) of $150,000, and lent Jones $150,000, which she invested in Bleachers (through KF Pecksland), bringing her aggregate investment to $280,000 (or $290,000 with the "option").

67.   Klein nonetheless continued to solicit Jones for additional investments.  On March 12, 2016, a Saturday, he told her that defendant Offit had been at his house, and he had had a "90-minute conversation" with Offit, who had asked and was going to purchase $2 million of additional Bleachers stock.  He told Jones that he and Offit were "discussing" allotting to Jones "an additional $1.5-2 million of Bleachers stock."  He asked Jones whether she could get to Bleachers' offices at 11:30 a.m. on Monday, to continue discussions.

68.   He told her he was meeting that Monday at 11:00 a.m. with *Sports Illustrated*, which "wanted Bleachers as its streaming platform."  He told her his schedule was "being ravenously eaten by deals."  He told her "[y]ou have fighter pilots at the controls in Bleachers," and he repeated that Offit was going to purchase $2 million of additional stock.

69.   Jones, at Klein's urging and insistence, presented the "investment opportunity" to additional family members and friends.  Klein continued to press her, advising her that she had "only a limited time left" to make the investment "before the valuation goes up." With each investor friend of Jones, Klein would give them only a few days to decide, putting intense pressure on Jones and her friends, claiming that he was getting pressure himself from defendant Offit.

70.   Klein arranged a meeting to take place at defendant Offit's office at Offit Capital in New York City on April 6, 2016.  Klein and Offit attended; Jones brought two friends to meet Klein and Offit and to learn about Bleachers:  Jeffrey Miller and a musician friend, David Hodge.

71.   At the conclusion of the meeting, Offit accompanied Miller out.  When Offit returned, he said. "[h]e's interested."  Klein replied "I don't want the finance guy [as an investor].  I want the rock and roll guy," as he pointed to Hodge.

72.   As a result of the foregoing, in the period January through April, 2016, and on December 1, 2016, a period when Bleachers was financially failing and in a "critical" state, Jones and her family and friends made the following investments in Bleachers (through KF Pecksland), totaling $718,000.00:

| First Transfer Date | Investor or Plaintiff | Amount |
|---|---|---|
| January 26, 2016 | Jodi Ann Jones/Matt Franklin | $130,000 |
| March 3, 2016 | Jodi Ann Jones | $150,000 |
| March 3, 2016 | Sean Diffley | $150,000 |
| March 23, 2016 | Jodi Ann Jones/Erin Marszalek | $20,000 |
| February 29, 2016 | Jodi Ann Jones/Evgeniy Kirichenko | $120,000 |
| January 20, 2016 | Jodi Ann Jones | $10,000 |
| December 1, 2016 | Jodi Ann Jones | $5,000 |
| March 14, 2016 | Jodi Ann Jones/Jack Becht | $20,000 |
| April 17, 2016 | Will Nock/HIMLA Holdings, Inc. | $25,000 |

| First Transfer Date | Investor or Plaintiff | Amount |
| --- | --- | --- |
| April 4, 2016 | Frank Pitt | $25,000 |
| February 29, 2016 | Jodi Ann Jones /Adam Rodriguez | $10,000 |
| March 4, 2016 | Jodi Ann Jones/Maria Rodriguez | $18,000 |
| March 1, 2016 | Jodi Ann Jones/Zachary Rodriguez | $10,000 |
| April 6, 2016 | Jodi Ann Jones/Xiao Ling Weng | $25,000 |

**The Board's and Management's Knowledge of Klein's Activities**

73.   Throughout the scheme described herein, the officers and directors of Bleachers either had knowledge of Klein's activities, or were recklessly indifferent to such activities, closing their eyes to the red flags around them.

74.   Defendant Lipari, a director of Bleachers and a lawyer, prepared the documents that Klein had the plaintiffs execute.  Jones emailed for Lipari, at Klein's direction, a spreadsheet containing and reflecting the names and investments made by plaintiffs.  Lipari provided his law office to Klein in which to conduct at least one meeting with a prospective investor Klein had urged Jones to bring in.  Klein told Jones repeatedly that Lipari was his long-time counsel, and that he was charged, among other things, with taking take care of any tax consequences of Klein's sale of KF Pecksland's and Bleachers' interests to plaintiffs.

75.   Emily Mommsen, the chief financial officer of Bleachers, met with plaintiff Jones and with Sean Diffley, who later invested, in February 2016, to discuss Bleachers.  With knowledge of Jones's and Diffley's interest in Bleachers, she nonetheless provided to Jones and Diffley the KF Pecksland entity investment percentages that were represented by their investments.  On multiple occasions, defendant Mommsen provided Jones with the KF Pecksland entity investment percentages for other investors.

76.   Defendant Jordan disclosed to plaintiff Franklin and through Franklin to Jones that he knew throughout Klein's scheme that Klein was "the kind of person" who "takes

money from the Joneses of the world," that Klein had told Jordan that Jones was a millionaire photographer who was in love with him, and that he "could get more money out of" Jones. Jordan told Franklin that what Klein had done to Jones was "criminal."

77.   Defendant Offit's participation in the March 12, 2016 meeting described above was another red flag.  He either knew of Klein's scheme, or was reckless in not knowing. His agreement to meet with other investors identified by Jones (which did not occur) was similarly a red flag.

78.   The worsening financial condition of Bleachers and Klein's increasingly desperate efforts to locate funding were themselves red flags.

79.   Management and the board of Bleachers failed to supervise Klein, failed to keep themselves informed of his activities, and failed to make adequate inquiry in the face of indications of fraud.

80.   Had the officers and directors properly performed their duties, plaintiffs' losses could have been avoided.

**The Failure of Bleachers and the Revelation that Klein had Deceived Plaintiffs**

81.   Ultimately, because Jones was unable to recruit sufficient investors to bring the investments channeled through her to $1 million, Klein told her she had hurt his relationship with defendant Offit, and became angry with Jones.  Klein and Jones did not communicate for some time.

82.   In July 2016, after many requests, Jones received minutes of the Bleachers board meeting of January 13, 2016.  This was the first notice she had received that the company had cash flow difficulties and required additional investments.  The minutes flatly contradicted what Klein had repeatedly told her about the need for capital and investment.

83.   On October 24, 2016, Klein called Jones to tell her that defendant Jordan, the chief revenue officer of Bleachers who he had previously advised was essential to the company's sales efforts, had left the company.  He told Jones that $100,000 of defendant Jordan's stock was available, and asked if she wanted to purchase it.  She said no.  He asked her to loan him $36,000 to buy more stock in Bleachers, saying that defendant Offit would be infusing $1.5 million into an investment they were making together.  Jones declined.

84.   On November 8, 2016, Jones and Diffley met with Klein.  They had asked Klein to bring financial statements and board minutes of Bleachers.  He did not.  He told them that "Offit has changed his mind," and would not put additional monies into Bleachers.

85.   On November 21, 2016, Jones received an urgent phone call from plaintiff Franklin and his friend John Paul Munhall.  Munhall advised Jones that he and defendant Jordan, had just spoken.  He told her that Jordan had informed him that "the second that Jones wired her money to Klein it was gone," that Klein "had told him and others that Jones was a millionaire photographer" who was "in love with him," and from whom "he could get more money," that "Sam [Klein] [had misused] Bleachers funds," and that "the actual value of Bleachers was not $25 or $50 million, but rather between $2-4 million."

86.   During November 2016 through January 2017, Jones continued to follow up with Klein, attempting to ascertain the truth about her investments and those that Klein had channeled through her.  She learned very little, other than that while Klein continued to talk up the company's prospects, it continued to struggle financially.

87.   During this time, Jones also repeatedly asked Klein to perform his promises and return her (and her friends' and family's) money.  Klein repeatedly told her to "just wait a

few more weeks . . . just wait until after February. . ..  Bleachers rowing deals were going to make the company more profitable than ever."

88.  Klein never had an intention to perform the financial promises he had made to Jones and to the others investors through Jones.

89.  Bleachers ceased business activities on or about February 9, 2017.  It vacated its business premises shortly thereafter.  Upon information and belief, it left a trail of commercial obligations.

90.  Klein and Jones continued to discuss Bleachers sporadically during February 2017.  Klein variously blamed the company's failure on the ineptitude of its chief financial officer, the failings of other officers, and the refusal of wealthy board members to continue to fund the company as he claimed they had promised they would.

91.  On or about February 20, 2017, Klein assured Jones that he would start a new company that would assume the business he had developed at Bleachers, and would thus be able to reimburse Jones and the other plaintiffs their investments.  At the same time, he told Jones that he needed her to invest another $60,000 in this new company.  She did not respond to this entreaty.

92.  This lawsuit follows.

**FIRST CLAIM FOR RELIEF**
**(For Violation of Section 12 of the Securities Act of 1933 as**
**Against Defendants Bleachers, KF Pecksland, and Klein)**

93.  Plaintiffs repeat and reallege each allegation of the foregoing paragraphs of this complaint numbered "1" through "92" as if fully set forth at length herein.

94.  As hereinabove more fully alleged, in connection with the sale of KF Pecksland's securities and Bleachers' securities to plaintiffs, defendant Klein made oral misrepresentations of fact.

95.  By reason of the foregoing, defendants Klein, KF Pecksland, and Bleachers violated Section 12 of the Securities Act of 1933,

96.  Plaintiffs are entitled to recover therefor from such defendants, jointly and severally, the principal sum of Seven Hundred and Eighteen Thousand ($718,000.00) Dollars, together with applicable prejudgment interest, attorneys' fees as provided by applicable law, and the costs and disbursements of this action.

**SECOND CLAIM FOR RELIEF**
**(For Violation of Section 10(b) of the Securities**
**Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder**
**as Against Defendants Bleachers, KF Pecksland, and Klein)**

97.  Plaintiffs repeat and reallege each allegation of the foregoing paragraphs of this complaint numbered "1" through "95" as if fully set forth at length herein.

98.  Defendants Bleachers, KF Pecksland, and Klein, directly and indirectly, by the use of means and instrumentalities of interstate commerce,  employed devices, schemes, and artifices to defraud plaintiffs; made the numerous untrue statements of material fact described in this complaint; and omitted to state material facts necessary in order to make the statements they did make, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, and courses of business which operated as a fraud or deceit upon plaintiffs, in connection with the sale and purchase of securities.

99.  Plaintiffs are entitled to recover from such defendants, jointly and severally, the principal sum of Seven Hundred and Eighteen Thousand ($718,000.00) Dollars, together with applicable prejudgment interest, attorneys' fees as provided by applicable law, and the costs and disbursements of this action.

### THIRD CLAIM FOR RELIEF
**(For Control Person Liability as Against Defendants
Bair, Connolly, Edwards, Guth, Jordan, Lipari,
Mommsen, Offit, Rosenbaum, and Rueckert)**

100.   Plaintiffs repeat and reallege each allegation of the foregoing paragraphs of this complaint numbered "1" through "99" as if fully set forth at length herein.

101.   Defendants Bair, Connolly, Edwards, Guth, Jordan, Lipari, Mommsen, Offit, Rosenbaum, and Rueckert, as officers and directors of Bleachers, were and are controlling persons of Bleachers within the meaning of Section 15 of the 1933 Act, 15 U.S.C. § 77o, and Section 20 of the 1934 Act, 15 U.S.C. § 78t.

102.   As controlling persons, they are jointly and severally liable for the liability of Bleachers as alleged in the first claim for relief set forth in this complaint.

103.   Plaintiffs are entitled to recover from defendants, jointly and severally, the principal sum of Seven Hundred and Eighteen Thousand ($718,000.00) Dollars, together with applicable prejudgment interest, attorneys' fees as provided by applicable law, and the costs and disbursements of this action.

### FOURTH CLAIM FOR RELIEF
**(For Common Law Fraud and Misrepresentation
as Against Defendants Bleachers, KF Pecksland, and Klein)**

104.   Plaintiffs repeat and reallege each allegation of the foregoing paragraphs of this complaint numbered "1" through "103" as if fully set forth at length herein.

105.   The statements of material fact made by defendants Bleachers, KF Pecksland, and Klein to induce plaintiffs to purchase securities in Bleachers and KF Pecksland were knowingly false when made, and were made to induce plaintiffs to rely thereon.

106.   Plaintiffs did rely thereon, and were injured by their reliance as aforesaid.

107.  Plaintiffs are entitled to recover from defendants, jointly and severally, the principal sum of Seven Hundred and Eighteen Thousand ($718,000.00) Dollars, together with applicable prejudgment interest, attorneys' fees as provided by applicable law, and the costs and disbursements of this action.

## FIFTH CLAIM FOR RELIEF
### (For Breach of Fiduciary Duty as Against Defendant Klein)

108.  Plaintiffs repeat and reallege each allegation of the foregoing paragraphs of this complaint numbered "1" through "107" as if fully set forth at length herein.

109.  Klein was and is a fiduciary of plaintiff Jones, and through her of all plaintiffs.

110.  In doing the acts and making the omissions described in this complaint, Klein breached fiduciary duties of loyalty, disclosure, fairness, and care.

111.  Plaintiffs are entitled to recover from defendants, jointly and severally, the principal sum of Seven Hundred and Eighteen Thousand ($718,000.00) Dollars, together with applicable prejudgment interest, punitive damages in such amount as the trier may deem just and proper, and the costs and disbursements of this action.

## SIXTH CLAIM FOR RELIEF
### (For Breach of Fiduciary Duties of Care and Loyalty as Against Defendants Bair, Connolly, Edwards, Guth, Jordan, Lipari, Mommsen, Offit, Rosenbaum, and Rueckert)

112.  Plaintiffs repeat and reallege each allegation of the foregoing paragraphs of this complaint numbered "1" through "111" as if fully set forth at length herein.

113.  By reason of the foregoing, defendants Bair, Connolly, Edwards, Guth, Jordan, Lipari, Mommsen, Offit, Rosenbaum, and Rueckert, as directors and officers of Bleachers, breached their fiduciary duties of care and loyalty owed to plaintiffs.

26

114.  Plaintiffs are entitled to recover from defendants, jointly and severally, the principal sum of Seven Hundred and Eighteen Thousand ($718,000.00) Dollars, together with applicable prejudgment interest, punitive damages in such amount as the trier may deem just and proper, and the costs and disbursements of this action.

## SEVENTH CLAIM FOR RELIEF
**(For Violations of the Connecticut Unfair Trade Practices Act,
Conn. Gen. Stat. §§ 42-110a, et seq. as Against All Defendants**

115.  Plaintiffs repeat and reallege each allegation of the foregoing paragraphs of this complaint numbered "1" through "114" as if fully set forth at length herein.

116.  By reason of the foregoing, all defendants violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, et seq.

117.  Plaintiffs are entitled to recover therefor from defendants, jointly and severally, the principal sum of Seven Hundred and Eighteen Thousand ($718,000.00) Dollars, together with applicable prejudgment interest, attorneys' fees as provided by applicable law, punitive damages in such amount as the trier may deem just and proper, and the costs and disbursements of this action.

WHEREFORE, plaintiffs demand judgment against defendants in the principal sum of Seven Hundred and Eighteen Thousand ($718,000.00) Dollars, together with applicable prejudgment interest, attorneys' fees as provided by applicable law, the costs and disbursements

of this action, punitive damages, and such other relief as the Court may deem just and proper in

the circumstances.

Dated:  New York, New York
         March 16, 2017

KARLINSKY LLC

By: /s/ Martin E. Karlinsky
        Martin E. Karlinsky, Esq.
        Bonnie H. Walker, Esq.
1500 Broadway, 8th Floor
New York, New York 10036
(646) 437-1430
martin.karlinsky@karlinskyllc.com
bonnie.walker@karlinskyllc.com

*Attorneys for Plaintiffs*